Filed 1/30/26  P. v. Johansen CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>DAVID THOMAS JOHANSEN,<br><br>     Defendant and Appellant. | A171963<br><br>(Solano County<br>Super. Ct. No. F23-01172) |

After a jury convicted defendant David Thomas Johansen of felonious assault injuring a girlfriend or child's parent (count 2) and misdemeanor cruelty to a child (count 5), the trial court sentenced him to four years' probation and imposed a criminal protective order barring defendant from contacting his girlfriend or her four children, two of whom were fathered by defendant.  Defendant's sole contention on appeal is that the trial court erred in including his children in the 10-year stay-away order.

We affirm.

**BACKGROUND**

In 2023, defendant and D.S. had been in a dating relationship for approximately five years and had two children in common, L.J. and B.J.  The victim also has two other children, V.M. and M.M., from a prior relationship. Defendant, D.S., and the four children all lived in the same residence.

1

One day—in March 2023—D.S. noticed defendant "had been acting like just irrational and paranoid for a few days," being "verbally abusive . . . and just being manic." He accused her of having an affair with the neighbor while he was at work or sneaking someone in the house when he was in the backyard. D.S. asked defendant, who "had been drinking a lot," to leave. Defendant refused, and D.S. threatened to call the police. Defendant then "lunged" at her and "attacked" her, throwing her "into the walls a couple of times" and then "tackl[ing her] into the kitchen doorway." She did not call the police, rather she tried to calm defendant down telling him she would not call the police. She also told defendant she had not cheated, trying to reassure him. The next day, defendant apologized. D.S. was "bruised" on her back and ended up with a "giant scar on [her] leg left over from that."

Months later, in August, D.S. noticed defendant had "not [been] sleeping at all." He had been "drinking very heavily," and was "starting to get very paranoid and just like scary" over a three-day period. On the fourth night, defendant texted D.S., while she was at the children's soccer practice and told her she "was kicked out of the home but the kids weren't." Around 7:00 p.m. that night, D.S. returned home to feed the children and talk to defendant. She found defendant sitting in the backyard with a half a bottle of whiskey and a beer, smoking. D.S. sat at the table with defendant, and he began calling her a "soulless evil woman for screwing him with [her] best friend, [her] neighbors," and calling her a "Bitch, whore, skank, all that kind of stuff." He was "pointing, gesturing toward" D.S. with "[j]ust very aggressive type mannerisms and this intense look in his eye," which D.S. described as "[s]uper scary." D.S. just kept her head down. M.M. and B.J. came outside after dinner, and D.S. picked up B.J. and held him as she sat at the table.

Defendant went into the house and when he returned, he grabbed D.S.'s hair from behind and "yanked" her. She felt a knife, a "cold metal, and pressure" on her throat. She felt "if [she] even like swallowed or breathed it was going to slice into [her] neck." D.S. was "[t]errified." B.J. was still in her arms, and M.M. was in front of her "screaming and saying 'Stop.'" Defendant pulled D.S. back into the house and "threw" her onto the kitchen floor. Defendant kept the knife at D.S.'s throat, and B.J. was about "six, eight inches away," still in D.S.'s arms. M.M. followed them inside and he, along with L.J. and V.M., were "yelling and screaming for [defendant] to stop, get off Mommy." Defendant hit D.S. "a few times, kicked [her] legs," and then ordered the children and D.S. to go sit on the couch. D.S. was still holding B.J.

Periodically, defendant would point the knife, a "blue-handled cleaver, so squarish" and "about six inches," at D.S. and say, " 'Admit it. Admit it. If the kids weren't here, you wouldn't be here. How can you betray me,' that kind of stuff." Defendant grabbed a second knife, a paring knife, which was "only two inches," and had both knives in his hands. The whole time, defendant "continued rambling about who [she] was sleeping with, how dishonest [she] was," and that "if we didn't have children present that this would be going much different." He also continuously called her names, " 'Stupid cunt,' " " 'bitch,' 'whore,' you know, just that same kind of soulless stuff." He gave D.S. her phone and told her to text her sisters that she needed to find a place to stay. She began texting her sisters and mother in a group text. She managed to text, " 'Help.' " But defendant took the phone back, accusing D.S. of texting another guy. He then broke the phone, bending it and "snapp[ing] it" and threw it on top of the kitchen cabinets. He resumed making accusations.

At one point, defendant, who was "twice [D.S.'s] size," came over and "kicked his foot across [D.S.'s] shin" with "full force." He later came over and "slapped [her] in the face" twice. He began playing a recording, on which he said he could hear D.S. " 'sucking his dick. I can hear you hiding. Okay. I can hear you guys laughing at me. It's all on this recording.' " But D.S. stated the recording was "nothing but static." He played the recording for hours, and then at one point he went and grabbed a speaker to amplify the recording, but it was still static. M.M. and B.J. eventually fell asleep on the couch, but V.M. and L.J. stayed awake with D.S. "[S]hear [*sic*] terror kept [her] on the couch."

At one point, defendant took V.M. and went to the store to get more cigarettes and drinks. While he was gone, D.S. grabbed a chair and retrieved her cell phone, which defendant had thrown on top of a kitchen cabinet. She sent a "911 emergency text to [her] sisters and [her] mom's group text," then deleted the message from her text so defendant would not see it, "threw [the phone] back up on top" of the cabinet and sat back on the couch.

Defendant returned after 15 minutes and resumed name calling and playing his recordings. At around 4:00 a.m., defendant's "demeanor changed," and he allowed D.S. to take the children and leave. He also gave D.S. his debit card to get gas and retrieved her phone from the top of the cabinet. After D.S. got gas, she called her mother to let her know they were coming over. After she left, defendant texted her accusing her of meeting up with his boss. D.S. texted him a picture of "a little grocery store" so he could see she was not with anyone.

D.S. had some bruising on her face, legs, and chin. She also had "marks on [her] legs" from defendant's kick and described it as "pretty painful." She additionally had a black eye.

4

M.M., who was seven years old at the time of the incident, remembered defendant "hitting [his] mom and frightening her with a knife because he was drunk." He had been asleep on the couch, but "woke up to the sound of [his] mom getting hit." D.S. was crying and had "tears going down her face and a black eye." Defendant was "standing up in the living room hitting [his] mom." M.M. did not think B.J. had been born yet. M.M. described the hitting as "smacking her with his hand." Defendant was also "holding a knife," which M.M. described as "wood-handled" with a " 'rectangle-ish' blade on it." Defendant was "cussing, yelling, and all of that." He "used the F-word, B-word, and that's it." M.M. was scared, and he started crying. He was later "able to grab the knife out of [defendant']s hand." He was "too scared to use it" because he thought he would get arrested and "threw [the knife] to the kitchen and it landed under the table." He saw L.J. wake up and she was crying. At some point, D.S. got up, pushed defendant back, and ran to get V.M., who was sleeping in a different room. M.M. "shin-kicked" defendant when he tried to go after D.S. After that, M.M. just remembered being in the car with the rest of his siblings and D.S.

Vacaville Police Officer Michael Mahlberg received a call for a welfare check at around 4:50 a.m. about a "[p]ossible domestic violence . . . about a knife being involved possibly" at defendant's and D.S.'s residence. Upon his arrival at the house, he found defendant sitting outside. Mahlberg checked inside the home to see if anybody else was inside or injured. Finding no one, Mahlberg got in contact with D.S., who "advised [him] that a physical altercation had occurred. She advised how a knife had been put to her neck. She had been assaulted." Mahlberg asked D.S. to come to the police station, and D.S. did so, arriving shortly thereafter. At the police station, Mahlberg

5

observed "a little bit of bruising to one of [D.S.'s] eyes" and "red marking on her neck area," and D.S. told him about "some physical injuries on her legs."

The Solano County District Attorney filed an amended information alleging one count of kidnapping, a felony (Pen. Code, § 207, subd. (a)—count 1),[1] one count of injuring a spouse/cohabitant/partner D.S., a felony, (§ 273.5, subd. (a)—count 2), one count of felony assault with a deadly weapon (§ 245, subd. (a)(1)—count 3), felony child abuse (§ 273a, subd. (a)—count 4) as to his and D.S.'s child B.J., three counts of misdemeanor cruelty as to M.M. and V.M. (D.S.'s other children) and L.J. (defendant's second child with D.S.), respectively (§ 273a, subd. (b)—counts 5–7), and one count of misdemeanor vandalism (§ 594, subd. (b)(1)—count 8).  It was further alleged as to count 1 that defendant personally used a deadly and dangerous weapon, a cleaver (§ 12022, subd. (b)(1)) and as to counts 1 through 4 that the crime involved great violence (Cal. Rules of Court, rule 4.421(a)(1)); defendant used a weapon at the time of the commission of the crime (*id.*, rule 4.421(a)(2)); defendant took advantage of a position of trust (*id.*, rule 4.421(a)(11)); defendant engaged in conduct indicating a serious danger to society (*id.*, rule 4.421(b)(1)); and defendant's prior adult convictions or juvenile sustained petitions are numerous or of increasing seriousness (*id.*, rule 4.421(b)(2)).

The jury found defendant guilty of counts 2 (injuring a girlfriend or child's parent) and 5 (endangering child's person or health), not guilty of count 8 (vandalism), and hung on the remaining counts.  The court declared a mistrial on counts 1, 3, 4, 6, and 7, and the court granted the People's motion to dismiss them.  The court sentenced defendant to three years in prison, suspended imposition of sentence, and placed defendant on four years' formal

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

6

probation, subject to various terms and conditions. Additionally, the court filed a 10-year criminal protective order for D.S. and all four children, M.M., V.M., L.J., and B.J. against defendant (§ 273.5, subd. (j)).

## DISCUSSION

Defendant contends because his children (L.J. and B.J.) "were not victims of a domestic violence crime, because [he] never sought to harm them, and because [he] has a fundamental constitutional right to see them over the next ten years, their names must be stricken from the stay away order." (Capitalization & boldface omitted.)

We review issues of statutory interpretation de novo. (*People v. Delarosarauda* (2014) 227 Cal.App.4th 205, 210 (*Delarosarauda*).) " 'When interpreting a statute, a court's fundamental task is to determine the Legislature's intent so that the purpose of the statute may be effectuated.' [Citations.] 'Courts begin by giving the statute's words a plain, ordinary, and commonsense meaning and then consider the words within the entire context of the statutory framework, keeping in mind the nature and purpose of the statute. [Citation.] If the statutory language is susceptible to more than one reasonable interpretation, then courts may consider extrinsic aids such as legislative history and public policy.' [Citations.] '[I]f the statutory language is clear, courts must follow the statute's plain meaning unless to do so would lead to an absurd result that the Legislature could not have intended.' " (*People v. Pena* (2025) 113 Cal.App.5th 640, 645 (*Pena*).)

*Applicable Statutes*

Although the trial court issued the stay away order pursuant to section 273.5, both that section and section 136.2 are at issue here.

Section 273.5, subdivision (j) provides, "Upon conviction under subdivision (a), the sentencing court shall also consider issuing an order

restraining the defendant from contact with the victim, which may be valid for up to 15 years, as determined by the court. It is the intent of the Legislature that the length of a restraining order be based upon the seriousness of the facts before the court, the probability of future violations, the safety of the victim and their immediate family, and the information provided to the court pursuant to Section 273.5. This protective order may be issued by the court whether the defendant is sentenced to state prison or county jail, or if imposition of sentence is suspended and the defendant is placed on probation." (§ 273.5, subd. (j)(1).) Subdivision (a) provides, "A person who willfully inflicts corporal injury resulting in a traumatic condition upon a victim described in subdivision (b) is guilty of a felony. . . ." (*Id.*, subd. (a).) Subdivision (b), in turn, provides, "Subdivision (a) shall apply if the victim is or was one or more of the following: [¶] (1) The offender's spouse or former spouse. [¶] (2) The offender's cohabitant or former cohabitant. [¶] (3) The offender's fiancé, or someone with whom the offender has, or previously had, an engagement or dating relationship. . . . [¶] (4) The mother or father of the offender's child." (*Id.*, subd. (b)(1)–(4).)

In *Delarosarauda, supra*, 227 Cal.App.4th 205, a case on which defendant relies, a jury convicted the defendant of corporal injury to a spouse, assault by means likely to produce great bodily injury, assault with a deadly weapon, and misdemeanor vandalism. (*Id.* at p. 208.) The trial court ordered the defendant to stay away from the victim and her two children—the defendant's son and stepdaughter—for 10 years pursuant to section 237.5. (*Delarosarauda*, at pp. 208–209.) On appeal, the defendant maintained the trial court lacked authority under that section to issue such an order. (*Id.* at pp. 209–210.)

8

The Court of Appeal agreed, holding "[u]nder the plain language of section 273.5, the court lacked authority to issue a protective order as to [the children]. First, [the children] are not victims under section 273.5, subdivision (j). [The victim] confirmed the appellant never used physical force against them [citation]. Second, . . . the second sentence of section 273.5, subdivision (j)—addressing the length of the restraining order—does not modify the term 'victim' in the first sentence or expand it to include the children. Our interpretation is bolstered by the fact that the children do not fall within one or more of the categories of victims listed in section 273.5, subdivision (b). That statutory section limits the applicability of section 273.5, subdivision (a) to certain victims (spouses, cohabitants, fiancées, or parents of the offender's child), and correspondingly limits the scope of the restraining order authorized by section 273.5, subdivision (j). Thus, section 273.5, subdivision (j) does not authorize the court to issue a protective order as to [the children]." (*Delarosarauda*, *supra*, 227 Cal.App.4th at p. 213.)

The Attorney General acknowledges *Delarosarauda's* limitation as to the scope of a protective order under section 273.5 but contends the order issued here is permissible under section 136.2, subdivision (i)(1). Citing *People v. Beckemeyer* (2015) 238 Cal.App.4th 461 (*Beckemeyer*), and *People v. Race* (2017) 18 Cal.App.5th 211 (*Race*), the Attorney General asserts courts have repeatedly "construed the term 'victim' broadly enough to protect the immediate family members of a named victim of a charged crime if those family members have themselves been physically or emotionally harmed by the crime."

In *Beckemeyer*, the defendant pleaded guilty to attempted murder of a woman he had previously dated and to assault with a deadly weapon of the

9

victim's adult son. (*Beckemeyer*, *supra*, 238 Cal.App.4th at p. 464.) The trial court ordered the defendant not to have any contact with the victim and her son for 10 years pursuant to section 136.2, subdivision (i)(1). (*Beckemeyer*, at pp. 463–464.) In upholding the order, the Court of Appeal held "the statute encompasses a person, like [the son], who was actually assaulted during the domestic violence incident, and who accordingly meets the broad definition of 'victim' set forth in the statutory scheme." (*Id*. at p. 463, italics omitted.)

In *Race*, the defendant pleaded no contest to attempted lewd and lascivious acts upon a child under the age of 14 as to his niece, and the court dismissed the count as to his daughter. (*Race*, *supra*, 18 Cal.App.5th at pp. 213, 215.) The trial court ordered the defendant to stay away from his niece and daughter for 10 years pursuant to section 136.2, subdivision (i)(1). (*Race*, at p. 216.) In upholding the order, the Court of Appeal held "section 136 defines a 'victim' in a broad enough manner in which to include a victim of a charged count of which defendant does not stand convicted so long as the court had some competent evidence before it with which to conclude there was reason to believe the individual was a victim of a broadly defined domestic-violence-related offense involving harm or attempted harm such that a criminal protective order should be issued." (*Id*. at p. 216.)[2]

---

[2] The Attorney General also cites *People v. Clayburg* (2012) 211 Cal.App.4th 86. In that case, a jury convicted the defendant of two counts of stalking her former husband, the father of their daughter. (*Id.* at p. 88.) The trial court ordered the defendant not to have any contact with her daughter for 10 years pursuant to section 646.9, subdivision (k)(1), which is substantially similar to sections 273.5 and 136.2. (*Clayburg*, at p. 88.) On appeal, the appellate court held that "a member of the immediate family of a stalking victim (§ 646.9, subd. (a)) who suffers emotional harm, here a child, is a 'victim' for purposes of a postconviction restraining order." (*Ibid*.) In so holding, the court read the two sentences of section 646.9, subdivision (k), such that the second sentence was not limited "only to the length of the

During the pendency of this appeal, the Fifth and Second Districts issued *People v. Walts* (2025) 112 Cal.App.5th 127 (*Walts*) and *Pena, supra*, 113 Cal.App.5th 640. In these cases, the appellate courts discussed the "significan[ce]" of 2018 amendments to section 136.2 and took a different view than pre-amendment cases as to the scope of the term "victim" as used in that section. (*Walts,* at p. 142; *Pena,* at p. 646.)

*Pena* explained that "[b]efore 2018, section 136.2(i)(1) provided: 'In all cases in which a criminal defendant has been convicted of a crime involving domestic violence . . . or any crime that requires defendant to register pursuant to subdivision (c) of Section 290, the court, at the time of sentencing, shall consider issuing an order restraining the defendant from any contact with *the victim*.' (§ 136.2, former subd. (i)(1), italics added. . . .)" (*Pena, supra*, 113 Cal.App.5th at p. 646.) Effective January 1, 2018, the Legislature amended the statute to use the definite article to identify the relevant crime and to "add the qualifier 'of the crime' after 'victim.' (Stats. 2017, ch. 270, § 1.)" (*Ibid.*)

As amended, section 136.2, subdivision (i)(1) provides, "When a criminal defendant has been convicted of a crime involving domestic violence, as defined in Section 13700 or in Section 6211 of the Family Code . . . , the court, at the time of sentencing, shall consider issuing an order restraining the defendant from any contact with *a victim of the crime*. The order may be valid for up to 10 years, as determined by the court. . . ." (Italics added.) Section 136, subdivision (3) provides, "As used in this chapter: [¶] . . . [¶] (3) 'Victim' means any natural person with respect to whom there is

_____

restraining order" but also as casting "a 'wider net' than the first sentence" to expand the meaning of "victim." (*Clayburg*, at p. 91.) However, as we shall explain, we need not and do not address section 646.9, subdivision (k)(1).

11

reason to believe that any crime as defined under the laws of this state or any other state or of the United States is being or has been perpetrated or attempted to be perpetrated."

*Walts* examined the significance of these changes. " '[U]se of the indefinite articles "a" or "an" signals a general reference, while use of the definite article "the" (or "these" in the instance of plural nous) refers to a specific person, place, or thing.' [Citations.] Stated differently, the indefinite articles 'a' and 'an' generalizes their objects, while the definite article 'the' particularizes an object and is a ' "word of limitation" ' that refers to ' "something that . . . exits only one at a time." ' [Citation.]

"Applying these principles to the 2018 amendments to section 136.2(i)(1)," *Walts* reached three conclusions: "First, section 136.2(i)(1)'s reference to 'a victim' is not limited to a single particular victim. Through the use of the generalized indefinite article 'a' [citations], it is possible for a protective order to protect more than one person/victim.

"Second, the phrase 'of the crime' refers to a specific or particular crime due to the use of the definite article 'the.' [Citations.] Because section 136.2, subdivision (i) is the only part of section 136.2 that provides for postconviction protective orders, section 136.2(i)(1) is the only part of section 136.2, subdivision (i) that provides for a postconviction protective order of a 'victim' [citations], and the phrase 'of the crime' appears nowhere else within section 136.2, it is appropriate to focus on section 136.2(i)(1) to determine to which particular crime the phrase 'of the crime' refers. [Citations.] The phrase 'of the crime' is preceded in the same sentence by a reference to a criminal defendant who 'has been convicted of' one or more of several specifically enumerated crimes. (§ 136.2(i)(1).) As such, the meaning

12

of the phrase 'of the crime' is clear, it refers to one of the section 136.2(i)(1) crimes for which the defendant has been convicted. [Citations.]

"Third, it follows from the previous two conclusions that a protective order is available for one or more persons as long as each person is a 'victim' of any one of the specifically enumerated crimes under section 136.2(i)(1) for which the defendant has been convicted. [Citation.] That is, so along [*sic*] as there is reason to believe that an enumerated section 136.2(i)(1) offense for which the defendant was convicted 'is being or has been perpetrated or attempted to be perpetrated' against a particular person, that person is a 'victim' who may be protected by a section 136.2(i)(1) protective order. (See §§ 136(3); 136.2(i)(1).) If there is no reason to believe that an enumerated section 136.2(i)(1) offense for which the defendant was convicted 'is being or has been perpetrated or attempted to be perpetrated' against a particular person, that person is not a 'victim' and may not seek, or be named as [a] protected party by, a protective order under section 136.2(i)(1). (See §§ 136(3); 136.2(i)(1).)" (*Walts, supra*, 112 Cal.App.5th at pp. 142–143.)

"[S]ection 136.2(i)(1) does not," however, "require that a person be expressly identified in a charging instrument in order to be considered a 'victim.' Therefore, if a person meets the definition found in section 136(3), but only in specific relation a section 136.2(i)(1) enumerated offense . . . , that person is a 'victim' who may be protected under a section 136.2(i)(1) protective order irrespective of whether that person is expressly identified in the charging instrument." (*Walts, supra*, 112 Cal.App.5th at p. 144, fn. 4; *Pena, supra*, 113 Cal.App.5th at p. 647 [a " 'victim of the crime' may include a person not named in the count on which the defendant was convicted, so long as that person was a 'victim' of the same crime"].)

13

*Walts'* explanation as to the why the section 136.2 protective order at issue in that case exceeded the court's authority is instructive as to the statute's bounds following the 2018 amendments. There, "the information alleged the crime occurred between February 2012 and February 2017 and that the abuse was against T.W. No other timeframe is alleged, and no other abused person or victim is identified in the information. Similarly, the verdict form simply states that the jury found defendant guilty of violating section 288.5, subdivision (a) 'as charged in Count 1 of the Information.' Tina, as the mother of T.W., was an adult between February 2012 and February 2017 and thus incapable of being the victim of the charged section 288.5, subdivision (a) offense. Further, there is nothing in the record or the indictment to suggest that W.W. or M.W. were victims of the charged [section] 288.5, subdivision (a) offense. Therefore, the only victim of the section 288.5 offense for which defendant was convicted, and the only person who can be protected by a protective order under section 136.2(i)(1), is T.W. Because the trial court included Tina, W.W., and M.W. as protected parties under the protective order, the court erred." (*Walts, supra,* 112 Cal.App.5th at p. 144, fn. omitted.)

Thus, as we understand the *Walts-Pena* analysis, when a defendant is convicted of violating a statute that makes domestic violence against a specific class of adult (such as a spouse, domestic partner, or cohabitant) a crime, a protective order under section 136.2 can only issue as to the adult (as that is the "only victim of" such an offense) and not as to children who are present during the violence, regardless of the physical risk of harm to them during the violence and/or the emotional trauma inflicted by witnessing the violence perpetrated against the adult.

14

We also observe that in *Pena* and *Walts,* and in *Delarosarauda*, the persons listed in the protective orders either were not present during the incidents of domestic violence or did not suffer "harm as a result" of the offenses for which the defendants were convicted. (*Pena, supra*, 113 Cal.App.5th at pp. 643–644, 647–649 ["Nathaly . . . was not present when Pena committed sexual battery against Evelin"]; *Walts, supra*, 112 Cal.App.5th at pp. 132, 144 [the defendant's ex-wife and the other children did not suffer continuous sexual abuse]; *Delarosarauda, supra*, 227 Cal.App.4th at p. 211 [the victim testified the defendant " 'never touched' the children, and no evidence suggests [he] ever attempted to harm them"]; see *People v. Lopez* (2022) 75 Cal.App.5th 227, 237 [the minor children "were present but asleep" during incident].)

The instant case stands on different footing. Here, defendant was convicted not only of felony assault and battery of a girlfriend or child's parent (count 2), but also misdemeanor child endangerment (count 5), a predicate conviction for issuance of a protective order under section 136.2. In addition to the evidence pertaining to M.M., who was the named victim of the child endangerment count, the evidence also showed defendant harmed or attempted to harm B.J. and L.J. D.S. testified that when defendant threw her to the ground, held a knife to her throat, and dragged her into the house, she had B.J. in her arms and the child was only about "six, eight inches away" from the knife. Defendant also hit D.S. "a few times" while she was holding B.J. M.M. followed them inside and he, along with L.J. and V.M., were "yelling and screaming for [defendant] to stop, get off Mommy." All of the children remained present while defendant forced D.S. to listen, for hours, to his recordings of static and his yelling rants about D.S.'s claimed infidelity. In sum, there was "reason to believe that" the criminal conduct of

15

which defendant was convicted specifically with respect to M.M., also threatened injury to the other three children.

It is of no import that the trial court erroneously relied on section 273.5, rather than section 136.2, in issuing the protective order. " ' "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." ' " (*People v. Zapien* (1993) 4 Cal.4th 929, 976.) We shall therefore direct the trial court to check the box for the applicable statute—section 136.2, subdivision (i)(1)—and to delete the check mark in the box for section 273.5, subdivision (j).[3]

### DISPOSITION

The judgment is affirmed. The trial court is directed to modify the protective order as V.M., M.M., L.J., and B.J. to reflect the proper statutory authorization, section 136.2, subdivision (i)(1).

---

[3] Given our conclusion that there were grounds for issuance of the protective order, we need not and do not address defendant's contention that inclusion of his children in the protective order—assertedly without any grounds to do so–"infringed on [his] fundamental right as a parent to participate in his children's life over the next ten years."

_____

Banke, J.

We concur:

_____

Humes, P. J.

_____

Langhorne Wilson, J.

A171963, People v. Johansen

17